SAMUEL H. GREY, attorney-general, ex rel. Morris & Cummings Dredging Company, informant and MORRIS & CUMMINGS DREDGING COMPANY

*v.*

THE GREENVILLE AND HUDSON RAILWAY COMPANY.

[Filed April 17th, 1900.]

1. Under Chancery rule 213, providing that a motion to strike out the information and bill shall have the effect of a demurrer, a motion to dismiss an information and bill in chancery for an injunction should not be reserved for future determination on final hearing, but should be determined as to all questions of law on the admitted facts, and questions as to jurisdiction of the chancery court, and of want of equity, before a preliminary injunction is granted.

2. Where a dredging company was relator in an information by the attorney-general to enjoin the building of a railroad in a manner contrary to law, across a street giving access to relator's.land, the fact that a bill on behalf of the dredging company, filed with the information, and seeking the same relief, was dismissed for want of equity, because of its failure to show a special injury, did not have the effect of dismissing the information, and the information may be retained.

3. Section 11 of the General Railroad law, as amended March 10th, 1891 (*P. L. of 1891 p. 129;* *Gen. Stat. p. 2660* ¶ *83*), providing that railroad companies may, before or after the completion of the main line, construct "branches within the limits of any county through which said road may pass," does not restrict a railroad company owning a railroad, the termini of which are within a county and no part of which lies outside the county, from building a branch line.

Grey v. Greenville and Hudson Railway Co.

4. Section 11 of the General Railroad law, as amended March 10th, 1891 (*P. L. of 1891 p. 129; Gen. Stat. p. 2660 ¶ 83*), authorizes railroad companies to build such branch lines as they may deem necessary within the limits of any county through which their roads may pass, and *P. L. of 1893 p. 175 ch. 90* authorizes railroad companies to build branch lines from their main lines to mills, factories or clay-beds, "provided that no railroad corporation shall construct any branch lines within the limits of any city or town of this state until it shall first obtain the consent of the municipal authorities of such city or town thereto."—*Held*, that the proviso contained in the act of 1893 applies only to branch lines to mills, factories and clay-beds, and not to branch lines constructed under the act of 1891; and where a railroad company desired to build a branch line under the later act, the consent of a city within the limits of which it commenced was not a prerequisite.

5. The road complained of and proposed to be constructed by defendant as a "branch road," under section 11 of the General Railroad law, as amended March 10th, 1891 (*P. L. of 1891 p. 129; Gen. Stat. p. 2660 ¶ 83*), held, on the facts now presented, not to be a branch road, and a preliminary injunction will issue against it on the information of the attorney-general.

6. Where a railroad company is about to construct a branch line without authority of law, and in excess of its statutory powers, it will be enjoined in a chancery court, on the information of the attorney-general, though no injury to the public occasioned thereby is shown.

On application for preliminary injunction and motion to strike out supplemental information and bill. Heard on information and bill and affidavits, answer and affidavits, supplemental information and bill and affidavits and answering affidavit.

The defendant is a railroad company organized in 1895, under the General Railroad laws. Its railroad is located entirely within the limits of the city of Jersey City, in the county of Hudson, is two and sixty-two hundredths miles long, and the beginning and ending points are both points in the railroad of the Lehigh Valley Terminal Company. The route as located runs in a general northerly direction near the shore of New York bay and crosses a public street called Chapel avenue, in the southerly part of Jersey City, which runs east and west and terminates on the tide-waters of New York bay. The Morris & Cummings Dredging Company is the owner of the shore and lands under water at the end of the avenue, under deeds and riparian grants, and Chapel avenue is the only means of access to its valuable tract of land containing about fourteen and one-

half acres' shore front, and two hundred acres under riparian rights. Complainant has expended considerable sums in improving its lands (in addition to rentals paid the state, amounting to $80,000), but the filling in of the lands has not been completed, and the tract at present is actually occupied only by a few boat-houses, a stable and a single dwelling rented to tenants. The attorney-general, on the relation of the dredging company, filed an information against the railroad company (with which was joined a bill by the dredging company), charging that the railroad company was proceeding to construct its road across Chapel avenue on a location about two hundred and twenty-five feet west of its located route, and also that it intended on this location to cross Chapel avenue, at grade, without having first obtained the consent of Jersey City, as required by the fourteenth section of the General Railroad law, as amended March 17th, 1891. *P. L. of 1891 p. 169; Gen. Stat. p. 2661 ¶ 84.* The dredging company, as complainant, also alleged irreparable injury to their interests, if the road was crossed at grade, and the information and complaint prayed injunctions against the construction of the defendant's railroad across Chapel avenue, at grade, at any point outside of the located right of way, and against crossing the avenue, at grade, without the consent of the city. The special prayer for injunction in the original information and bill did not include a prayer to enjoin generally the construction of the railroad across the avenue outside of the located route, but only to enjoin the grade crossing outside of the route. Defendant's answer admitted its intention to construct a railroad across the avenue at the point in question, but denied that the crossing was to be at grade, and, by the affidavits filed before the answer, disclosed a plan for crossing under grade. The application for a preliminary injunction in the terms of the bill, which extended only to the crossing at the grade, was denied, the answer and affidavits denying the intention to cross at grade. Defendant's answer further disclosed that it intended to construct a railroad across the avenue as part of the route of a branch railroad called branch No. 1, located by it under the authority of the General Railroad laws, after the filing of the

information. The route and survey of the branch No. 1 is annexed to the answer, and shows that the branch begins at station 65 + 80 of the filed center line of the route of the Greenville and Hudson Railway Company, and running for a distance of one and twenty-six hundredths miles, all within the limits of Jersey City, terminates at the beginning point of the located route of the main line of the Greenville and Hudson railroad. The length of this main line from the beginning point to its station 65 + 80, as appears by the copy of the located route annexed to the original information, is about six thousand five hundred and eighty feet or one and one-quarter miles. Defendant's answer also shows that it is the owner of the lands north and south of Chapel avenue between the crossing of its main line and its branch No. 1, but the answer does not expressly claim any ownership in fee of the lands included within the street lines.

The answer of defendant also shows that its said land north of the avenue now contains more than twenty yard-tracks intended for a railroad yard, and that the tracks intended to be constructed across the avenue, under its located branch No. 1, are with the view of running its cars under the avenue, and making use of the land south of the avenue for yard room, and also for connecting with other railroad tracks lying to the south and used in the same general business, the defendant's railroad forming together with several other corporations a part of the Lehigh Valley system, formed for the purpose of receiving and sending to tide-water the traffic of this road. The order denying the preliminary injunction gave leave to amend the information and bill, and under this order a supplemental information and bill is filed, charging, first, that the location of defendant's branch No. 1, throughout its length, is practically parallel with that of its main line as located and about two hundred and twenty-five feet west thereof, and that this location of a so-called branch line is not in fact the location of a branch line, but is a re-location of its main line, which has not yet been fully constructed, and, as such re-location, is without authority of law; second, that the company has no authority, under the General

Railroad law, to locate any branch lines whatever; and third, that if it has any authority to locate and construct branch lines, the branch line being entirely within the limits of Jersey City, cannot, under the law of 1893, be constructed without the consent of the municipal authorities, which has not been obtained. The supplemental information also charges that in the construction of its undergrade crossing under the avenue, the company proposes to excavate the highway, which is fifty feet wide, and, after constructing its road, to carry the highway over it by a bridge only twenty-five feet in width, thus narrowing the highway to one-half of its width. Such method of construction is declared to be illegal and an irreparable injury to complainant. Decree is asked declaring that the construction of the road outside of the main line is illegal; that the construction of the road proposed, as a so-called branch line, is illegal; that the construction of the branch without consent of Jersey City, is illegal; and that defendant is without power or authority to interfere with the surface soil of the avenue by substituting a bridge and lessening the width of the avenue. An injunction is prayed restraining the construction of the branch No. 1 as located, and from narrowing the passageway of the avenue. On this supplemental information and affidavits, and on the original information and affidavits and answer, application is now made for a preliminary injunction. The defendant at the same time moves to strike out and dismiss the supplemental bill, on the ground that the dredging company has shown no such special interest or injury as entitles it to maintain a bill, its injury, if there be any, being sustained in common with the public. A motion is also made to strike out and dismiss the supplemental information and bill, as to the attorney-general and the dredging company and as to each of them, on the ground of misjoinder, and for want of equity in the bill, because no facts are stated showing any illegality or irregularity in the location of the branch line, or to show the necessity of the consent of Jersey City, to its location or construction, and for want of parties, the mayor and aldermen of Jersey City. The application for injunction and the motion to strike out are heard together.

*Mr. Lindley M. Garrison,* for the attorney-general and complainant.

*Mr. Charles L. Corbin,* for the defendant.

EMERY, V. C.

This hearing together of the motion to dismiss and the application for preliminary injunction is according to the usual practice where a demurrer or plea is interposed. *2 Dan. Ch. Pr. *596.* And the motion to strike out the information and bill, which has, under rule 213, the effect of a demurrer, must be first determined. A case on demurrer must be heard and fully determined as to all questions of law involved on the admitted facts, and these questions cannot be reserved for future determination on final hearing, as is sometimes done where important questions of law are raised on an application for preliminary injunction and want of equity in the bill is urged as an objection to such injunction. In view of this bearing of a decision upon demurrer, parties will sometimes, in a proper case, be put to a formal demurrer instead of a motion to dismiss, but in the present case it is not necessary, as the legal questions are fully raised by the motion and have been fully argued with a view to immediate decision, and I will therefore dispose of the legal questions arising on the motion.

As to the motion to dismiss the bill because the dredging company have not shown such special legal interest or injury as entitles them to file a bill, I think the motion must be granted on the authority of the decision of the court of errors and appeals in *H. B. Anthony Shoe Co.* v. *West Jersey Railroad Co., 12 Dick. Ch. Rep. 607, 618 (1898).* In that case the defendant, a railroad company, had constructed an additional track in a public highway on which complainant's property abutted, and the injury which complainant alleged was special in the sense that this obstruction to the highway specially interfered with the prosecution of its business, but the complainant did not own the fee of the highway, and it was therefore held that the legal right on which its alleged special injury was based was only the common right of the public to use the highway, and

the injury to complainant, although greater in degree, was in character the same as that of the entire public. There was, therefore, no special legal right or injury on which complainant's claim to equitable relief could be based, and the bill was dismissed. Mr. Justice Garrison, who dissents on one of the questions of equitable jurisdiction involved in the case, agrees with the majority of the court and with the court below in holding that no private right was involved and that the complainant's bill should be dismissed because it could not assert the public right.

The dredging company here shows no special legal right to the fee of the street at the place of crossing, and no injury different in character from the general injury to the public, and, therefore, while it may be relator to an information by the attorney-general, it cannot have a decree in its private right on the bill, and the supplemental bill must be dismissed. But the dismissal of a bill filed in connection with an information does not carry the information with it, and the attorney-general, if the information shows a right to relief, may have a decree. *1 Dan. Ch. Pr. (6th ed.) *11*, citing, inter al., Attorney-General v. East India Co., 11 Sim. 385, 388; Attorney-General v. Cockermouth Local Board, L. R. 18 Eq. 172, 179 (1874); Attorney-General v. Vivian, 1 Russ. 226. These are all cases where the complainants were, as here, not only complainants but relators in the information, and the misjoinder of a private bill with an information was not considered as affecting the attorney-general's right to a decree on information filed in the public interest. As relators, the dredging company are not required to have any special interest. *1 Dan. Ch. Pr. (6th ed.) *13*. The substantial questions raised on the application for injunction on the information and the motion to dismiss, are (1) whether the construction of a branch road by defendant company across the avenue is beyond its power under the railroad laws; (2) whether if it has such power the previous consent of the municipality is necessary to the construction; (3) whether the road proposed to be constructed is in fact a branch road within the meaning of the railroad laws; (4) whether, if all these questions be decided in defendant's favor, it should not still be enjoined from narrowing

the highway in the construction of its branch road across it. Two other questions may be noticed, which relate rather to the jurisdiction of this court or to its exercise on preliminary injunction. It is suggested in the brief of defendant's counsel, but not argued, that the restraint of the illegal exercise of the powers of a public company, even on final hearing, is not clearly a subject of equitable jurisdiction, and, therefore, should not be exercised by preliminary injunction. But, as above stated, the case being heard as on demurrer, must be considered as now on final hearing, for the purpose of deciding all legal questions involved on the admitted facts. And this question as to the jurisdiction in equity to restrain the excess of corporate powers, on the application of the attorney-general, where the excess tends to public injury, is settled by the decision in *Stockton* v. *Central Railroad Co., 5 Dick. Ch. Rep. 52, 78*. There is no reason, therefore, for withholding decision upon the question of defendant's powers to construct a branch road across the avenue until final hearing, on the supposition that jurisdiction to pass upon this question will then be declined. And inasmuch as the facts upon which this right to construct a branch at all across the avenue are undisputed, and only points of law are involved, which have been fully argued by counsel on both sides, as applicable both to the motion to dismiss the information and to the right to injunction, there is no sufficient reason for withholding the decision of these questions until a second argument on final hearing, and the question of the right to construct the branch should be disposed of on this motion, both in the interest of the public and of the company. The authority of defendant company to construct a branch line rests upon the eleventh section of the General Railroad law, as amended March 10th, 1891 (*P. L. of 1891; Gen. Stat. p. 2660 ¶ 83*), which provides that

"it shall be lawful for every corporation formed under the act * * * to construct, maintain and operate a railroad with a single or double track, with such side tracks, turnouts, offices and depots as they may deem necessary between the points named in the articles of association, commencing at or within and extending to or into any town, city, or village named as the place of the termini of such road, and from time to time, either before or after the completion of the main line, construct, maintain and operate branches within the limits of any county through which said road may pass."

The attorney-general claims that the language of this section as to the construction of branches clearly confines the construction of branches to those companies which pass through a county, and that the words "passing through a county;" as here used, means passing from one line or boundary of the county to another of its boundaries. As this portion of section 11 has been, from the time of the first enactment of the General Railroad law, in 1873, the only grant of express authority to construct either main lines or branch roads, and the grants for both purposes are expressly connected in this section, the construction which has been adopted as to the location and extent of the main lines which are authorized to be constructed must be considered as possibly affecting the construction which must be put upon the location and extent of the branch lines which are authorized. Soon after the passage of the General Railroad law the question was raised whether this section authorized the construction of any railroad the termini of whose main lines were both within the same town or city, and in *Long Branch Commissioners* v. *Railroad Co., 2 Stew. Eq. 566 (1878)*, it was held by Vice-Chancellor Van Fleet that such road was authorized, and this decision was approved in *National Docks, &c., Co.* v. *Central Railroad Co., 5 Stew. Eq. 755, 766 (Court of Errors and Appeals, 1880)*. This decision has been since acted on in many instances in the location of railroads entirely within the limits of a city or county and is unquestionable. It is next to be noticed that, so far as relates to the power of any road which can construct a main line, to construct branches also, the act does not, by express words, disclose any intention to withhold from any road authorized to construct a main line the authority also to construct branches. The power to construct branches is introduced in the section as a general power given to every corporation under the act, and the limitation of this power to railroads which do not have a route extending entirely between different boundaries of the county arises, if it exists at all, from an implied restriction. This implied restriction which is claimed, results from the subsequent description in the section of the character or location of the branches authorized, in which

subsequent description of the location of the branch road reference is made, as part thereof, to the extent or character of the location of the original road. As so described, the branches authorized are only "branches within the limits of the county through which the said road may pass," and the attorney-general claims that this expression has two clear results in reference to the construction of branch roads—*first*, to confine the branch itself within the limits of the county in which it starts from the main line, and *second*, to limit the power to construct branches to roads which pass through counties from one boundary to another. I cannot yield my assent to the second claim, and I think that in the absence of any direct express provision or necessary implication limiting the class of roads which is to have the power to construct branch roads, the general words of the section authorizing the construction of main lines, should extend also to the construction of branches, and should not be so limited as to deprive any company, which has the authority to construct a main line, of the right to construct branches. There is, in my judgment, no necessary implication in this case which requires that the words "county through which the said road may pass," which are used primarily to describe and limit the extent of the branch, should, with reference to the main line, be construed as necessarily meaning that the main line should "pass through" the county, in the sense of going from one boundary to another. The words "pass through," as here used in reference to the main line, may be considered as used in the sense in which an arrow is said to "pass through" the air, the notion of motion or location *in* a body or space being referred to. "Passage through" a county at the point of departure of the branch road from the main line was, as it seems to me, the object of the reference to the main line, and the fixing of the *terminus a quo* and the *terminus ad quem* of the main line, which could construct branches, by a reference to its "passing through" a county was not intended. With respect to the classes of railroads to be built under the General Railroad law, it has been declared that the construction of the act should be liberal. *National Docks Railway Co.* v. *Central Railroad Co., 5 Stew. Eq. 755, 766*

(*Court of Errors and Appeals, 1880*).   And the same construc-
tion should be adopted in reference to the general grant of the
powers of the act to all classes of corporations organized under
it, and none should be excluded from the exercise of a general
power, unless excluded expressly or by an implication so neces-
sary as to leave no doubt of the intention to exclude.

I conclude, therefore, that the defendant company has the
right to construct a branch road under this section, from its
main line, which lies entirely within a county, and does not pass
through it from one boundary to another.

The second question is whether the consent of the municipal
authority of Jersey City is necessary to the construction of a
branch road, under the act of March 10th, 1893 (*P. L. of 1893
p. 175 ch. 90*), entitled "An act concerning railroad corpora-
tions." Such consent has not been obtained, and if it is made
necessary by statute it is admitted that the information must be
sustained, and a preliminary injunction must be issued to enforce
it, under the authority of *Franklin Township* v. *Nutley Water
Co., 8 Dick. Ch. Rep. 601; Stockton, Attorney-General*, v. *At-
lantic Highlands Railroad Co., 8 Dick. Ch. Rep: 418; Grey,
Attorney-General*, v. *New York and Philadelphia Traction Co.,
11 Dick. Ch. Rep. 463.* The question as to the necessity of
municipal consent now arising under the act may be briefly
stated without reciting the act in full. The title of the act is
general, being "An act concerning railroad corporations," and, in
the first section, it confers upon all railroad corporations power
to construct branch lines from their main lines, and also from
existing or future branches thereof, to any mill, factory or manu-
facturing establishment or clay-bed, and for this purpose again
invests the corporation with its original power to take and acquire
lands. Three provisos then follow in the same section of this
grant of power to build branch lines, viz.,

"provided, however, that no such branch line shall be more than two miles
in length; and provided further, that the corporation 'which shall hereafter
construct any branch line or lines in pursuance of the power and authority
hereby conferred' shall file a route with the secretary of state and make a
deposit with the state treasurer; and provided further, that no railroad cor-

poration shall construct any branch lines within the limits of any city or town of this state, until it shall first obtain the consent of the municipal authorities of such city or town thereto."

The first and second provisos clearly and expressly apply only to the branches to clay-beds, &c., authorized by the act, but the third proviso is general in its reference to branches, and it is insisted by the attorney-general that the words of this proviso being general and not limited to the branches to clay-beds, &c., apply to any branch line thereafter constructed whether under the power to construct branch lines given by the General Railroad law, or the special branches to clay-beds authorized by the act of 1893. It is pointed out, and with force, that the title of the act is general; that instances of general legislation by provisos are not unusual, and that they have been sustained as such legislation in important instances.

Upon the other hand, it is contended by defendant's counsel that the recognized general rule in reference to the construction of such provisos is that they are to be taken as qualifying or limiting only the general powers conferred by the act in which they occur, and not as limiting grants of powers arising under other legislation. And numerous cases illustrative of this general doctrine are cited. It is admitted on both sides that the ultimate object to be reached by any principle or rule to be applied, is the ascertainment of the intention of the legislature in enacting the words of the statute in question, and that all rules and illustrations of construction are useful solely for this purpose of ascertaining the legislative intent as expressed by the statute. The considerations which constrain me to hold that the general words used in the third proviso of this section must be construed as applying only to the branches authorized by the act are two.

*First.* Their general application to all branches of railroads thereafter constructed would limit a general power to construct branches, which had been in existence from the passage of the General Railroad law, and make the power to build a branch line to any city or town of the state thereafter dependent on the consent of the municipality. This would be opposed to the general policy of the railroad laws, which leaves the general

power of construction of main lines and branches free and un-trammeled except by the conditions fixed by general laws enacted by the legislature in the general interest. If the general power of building branch roads given by the original Railroad law is thus limited in respect to branches constructed after the act of 1893, it will obviously affect or control, in the interest of then existing roads or their branches, the construction of competitive branches of other roads to towns or cities, and to this extent defeat the policy of the original act. To confer upon the munic-ipal authorities of any city or town a practical veto upon the power given to a railroad company to construct a branch to and within its limits, under the General Railroad law, would be such a departure from the scope and policy of the General Railroad law, and such a legislation in favor of special interests, that legis-lation claimed to have this effect should not be subject to any other reasonable interpretation. I am unwilling to infer the intention to confer much power from the mere use in a proviso of general language, which, if construed according to general rules of construction, admittedly proper for that purpose, can fairly and reasonably be limited to a special power conferred by the act itself, viz., to build branches to clay-beds, &c.

*Second.* In view of the obvious effect of giving to the proviso in question the effect claimed, the adoption of this construction must be imperative. This proviso, as will be noticed, is the third proviso of the section, and follows two previous provisos, the first of which, introduced by the words " provided, however," expressly applies only to the branches built under the act, and cannot apply to branches built under the existing general law. The second proviso, " and provided further," is not an inde-pendent proviso, which may reach to branches not included within the scope of the first proviso, but is strictly a further or additional proviso to the first, and like the first, reaches only to the branches built under the act. It is an additional or further limitation on these alone. The third proviso follows in the words, " and provided further," and the continued use of the word " further " describes the scope and character of this pro-viso, as also intended to be an additional proviso applicable to

the branches included in the two previous provisos, and not as a new or independent proviso, intended to reach branches which were not included at all within the previous proviso.

For these reasons, therefore, I conclude that the consent of the municipal authorities to the construction of the branch road was not necessary under the act of 1893.

The *third* question submitted is whether the road proposed to be constructed across Chapel avenue is in fact a branch road within the meaning of the act. Taking the undisputed facts in relation to this proposed "branch road," as disclosed by the answer to the original bill and the affidavits to the supplemental bill, my present view is that this road cannot properly be called a branch road. The usual and ordinary meaning of a "branch road," as applied to railroads, denotes, as was said by Mr. Justice Dixon, in *Akers* v. *United New Jersey Railroad Co., 14 Vr. 110, 112 (Supreme Court, 1881)*, a road connected, indeed, with the main line, but not a mere incident of it, or constructed simply to facilitate the business of the chief railway, but designed to have a business of its own for the transportation of persons and property to and from places not reached by the principal route. While these expressions were not intended and should not be applied as giving a fixed meaning to the word "branches," and while the circumstances of each case must ultimately control the application of the statute, yet the main principles of distinction which usually occur as between main lines and branches are stated with authority. These principles were applied in a case where the question was whether tracks leading to freight houses were branch roads within the power of the road to build. The road now proposed to be built begins and ends on the main line, and, so far as yet appears, reaches no other points or places for railroad service than those on the main line as located. The branch is practically parallel with the main line throughout its whole length, and distant only about two hundred and twenty-five feet therefrom. The intervening space, so far as now appears, is occupied by terminal yards connected with the main line or with the system of which it forms part, and the "branch" is constructed for the purpose of facilitating the use

25

of these terminal yards. This proposed line of tracks across the avenue is to be constructed, as the answer says,

"with a view to run its cars under the avenue on the said branch and make use of its railroad yard south of the avenue for yard room, and also connect with other railroad tracks lying to the south and used in the same general business."

This business is further described in the answer as the receiving and handling the traffic sent to tide-water over the Lehigh Valley system. The main line of the defendant's road is not yet completed, and on the facts as now disclosed in relation to the character and connection of the main line and the proposed branch, the construction of this "branch" is substantially the crossing of the avenue by the terminal yard—tracks connected with the main line as located. If these tracks are *bona fide* "branches" of the main line, it is difficult to see why the entire system of terminal tracks cannot be extended across the public highway as "branches." If, on the other hand, this "branch" is really intended to be used for the main route, then it must be so constructed under the special laws relating to re-location or straightening routes, and not as a branch.

I conclude, therefore, that the facts disclosed by the answer to the original bill and by the affidavits do not disclose authority in the defendant to interfere with the public highway under claim of right to construct this railroad as a "branch" road, and that such interference with the highway is in excess of the power of the company.

The affidavits in this case, while they show that the road, if constructed across the avenue, as proposed, will interfere to some extent with public travel, do not show such a probable interference with the present ordinary course of public travel as to create a serious public nuisance merely by interference with travel. Two important questions therefore remain to be considered—*first*, whether the attorney-general has the right to restrain the construction of the road without evidence of serious actual public injury, and *second*, whether a preliminary injunction

should go. As to the first question, the cases relating to the right of the attorney-general to intervene in the public interest, which are numerous, show that the distinction is between cases in which a public nuisance, by reason of interference with ordinary public travel, is the sole basis of complaint, and cases where the real injury on which the attorney-general's information is based is an illegal act on the part of a public company in excess of its powers, through which illegal act the public generally is affected.

In cases of the first class, based on nuisance to travel or passage, it is settled that the attorney-general, in order to obtain the aid of a court of equity, must show a serious public injury, which cannot be remedied in the ordinary tribunals. *Raritan Township* v. *Port Reading Railroad Co., 4 Dick. Ch. Rep. 11,* and cases cited at *p. 18.*

In cases of the latter class, excess of public powers affecting the public rights, the rule is settled by many authorities that the attorney-general is justified in interfering without evidence of actual injury to the public. In *Attorney-General* v. *Shrewsbury Bridge Co., 21 Ch. Div. 752 (Mr. Justice Fry),* all the previous English cases are examined and this rule declared to be settled. And this case also shows that as to the nature of the public interest to be protected, the interference with the public highways or the navigable waters of the state, by a public company in excess of its powers, is a sufficient public interest. This seems to me to be the true rule upon the question now involved. The protection of the state and the public rights against the illegal excess of powers is peculiarly under the charge of the attorney-general, and where this excess affects public rights in highways or navigable waters, the remedy of the state to control the excessive use of a power conferred for public use, should not be confined to the uncertain and incomplete remedies by indictment or action after the injury has been completed. For the complete relief and protection to which the attorney-general, as representing the public rights in highways, is entitled, restraint against the excessive use of power is necessary. The uncertainty

of protecting the public rights in highways by indictments against nuisances was one reason for the establishment of the doctrine that these public rights should also be protected by ejectment and by injunction, pursued by the municipal bodies vested with control of the highways. In *Hoboken Land and Improvement Co.* v. *Hoboken, 7 Vr. 540 (Court of Errors and Appeals, 1873)*, Mr. Justice Depue says, upon this point of protection of the public rights in highways by ejectment, in favor of municipal authorities: " To deny this form of relief and remit the public to a remedy by indictment for nuisances, would result in subjecting public rights in property to the varying moods of grand juries." In courts of equity, the right of the attorney-general to interfere, on behalf of the general public, for the protection of the public highways in a proper case never seems to have been questioned, and bills by municipal authorities for such protection are maintained on the ground that for this purpose they have a special interest or right different from that of the public at large, who can be represented only by the attorney-general. *Easton and Amboy Railroad Co.* v. *Greenwich Township, 10 C. E. Gr. 565, 567 (Court of Errors and Appeals, 1874)*. In view, therefore, of the clear tendency of the courts to increase rather than diminish the remedies necessary for the complete protection of the public interest in highways, it results *a fortiori* that no restriction or abatement should be made in the rights of the attorney-general to apply to a court of equity to protect the public highways from an unauthorized invasion by an excessive use of statutory public powers.

As to the issuance of a preliminary injunction, such injunction is usually necessary in order to afford the complete relief to which the public are entitled if in fact the interference with the highway is illegal, and preliminary injunctions seem to have been granted and approved in cases of this character where the right to ultimate equitable relief is clear upon the admitted facts. *Easton and Amboy Railroad Co.* v. *Greenwich Township, supra.* In cases involving the protection of private rights and municipal rights against excessive use of power by public com-

panies, a preliminary injunction is always granted, where necessary for the complete protection to which they are entitled on undisputed facts. *Township of Franklin* v. *Nutley Water Co.,* *8 Dick. Ch. Rep. 601,* and cases cited at *p. 606.* The public rights now asserted against the same kind of injury are entitled to the same protection, and the information does not come within the rule equally well established and enforced, where the rights to be protected and the injury complained of involve private property or rights only, that irreparable injury must be shown, in order to award a preliminary injunction.

In the case in hand timely notice has been given of the intention of the attorney-general to question the right of defendant to construct a railroad across the highway at the point in question, under any of the powers so far conferred upon the defendant, and there are no special circumstances in the case which entitle the defendant to proceed with the construction pending suit, subject to the liability to remove the obstruction upon decree at final hearing. In the absence of an answer to the supplemental information, and so long as the defendant's authority to construct a road across the highway depends solely upon the facts now disclosed, and admitted for the purpose of this argument and motion, the construction must be enjoined.

I will advise a decree dismissing the supplemental bill, denying the motion to dismiss the supplemental information, and directing a preliminary injunction until answer and further order. If defendant desires to appeal and files notice of appeal without delay, the informant will, as a condition of preliminary injunction, give the consents necessary to put the cause on the list for hearing at the June Term of the court of errors and appeals.